NOT FOR PUBLICATION                              [Docket. No. 24]

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

| | |
|---|---|
| BARBARA CHURCH,<br><br>     Plaintiff,<br><br>          v.<br><br>SEARS HOLDING CORPORATION et al.,<br><br>     Defendants. | Civil No. 12-cv-4814 (RMB/JS)<br><br>**OPINION** |

**APPEARANCES:**

William G. Blaney
Blaney & Donohue, P.A.
3200 Pacific Avenue – Suite 200
Wildwood, NJ 08260
     Attorneys for Plaintiff

Todd Alan Ewan
Christin Choi
Fisher & Phillips LLP
201 King of Prussia Road
Radnor, PA 19087
     Attorneys for Defendants

**BUMB,** United States District Judge:

### I.   **Introduction**:

     This matter comes before the Court upon a motion by

Defendants, Sears Holding Corporation and Sears Roebuck and Co.,

(hereinafter "Defendants"), for summary judgment pursuant to

Federal Rule of Civil Procedure 56(a). [Docket No. 24].  For the

reasons set forth below, Defendants' motion shall be granted.

1

**II.  Background:**[1]

A) <u>Plaintiff's Employment and Termination</u>

Plaintiff, Barbara Church, was tragically involved in a car accident in April of 2000, which resulted in her being in a coma for 21 days and hospitalized for several months.  (Plaintiff's Statement of Material Fact ("PSMF"); Defendants' Response to Plaintiff's Statement of Material Fact ("DRSMF") ¶¶ at 1-2).  As a result of this accident, Plaintiff experienced a traumatic brain injury. (PSMF ¶ 4; Defendants' Statement of Material Fact ("DSMF") ¶ 17).  Plaintiff states that her disabilities as a result of the brain injury include: short term memory loss, mild speech difficulty, muscle weakness, balance problems, and difficulty performing manual tasks.  (Pl.'s Ex. E, Church Deposition, Volume I ("Church Dep. I") at 65:6-75:24).

In 2007, Plaintiff began working at the Sears store located in Vineland, New Jersey, as a part-time Merchandise Customer Assistant ("MCA").  (DSMF at ¶ 2; Plaintiff's Response to Defendants Statement of Material Fact ("PRSMF") at ¶ 2).

---

[1] The facts recited herein are drawn from the parties' respective Rule 56.1 Statements of Material Facts, Defendants' Response to Plaintiff's Statement of Material Facts, and Plaintiff's deposition testimony. While there are factual disputes between the parties' accounts, the facts are construed in a light most favorable to Plaintiff, the non-moving party. <u>See</u> <u>Kopec v. Tate</u>, 361 F.3d 772, 775 (3d Cir. 2004).  Thus, whether there is a genuine dispute, this Court relies on Plaintiff's statement of material facts.

Plaintiff was a part-time, minimum wage employee, and her hours fluctuated according to the needs of Sears' business. (DSMF at ¶ 4; PSMF at ¶ 8). In 2007, Plaintiff received a copy of the Sears Associate Handbook (DSMF; PRSMF at ¶ 5). The 2010 version of the Handbook contains a policy prohibiting discrimination of any kind within the workplace. (Id. at ¶ 6). Plaintiff was aware that Sears had a policy of accommodating individuals with disabilities, but states that there is no evidence that she ever received the 2010 Handbook. (Id. at 8 & PRSMF at ¶ 10). The November 2010 Handbook included a phone number for an Ethics and Compliance Helpline (called "88Sears"). (PRSMF at ¶ 11). While Plaintiff acknowledged that she knew of the "phone line" she stated that she "did not think she called the 'phone line' because it 'never occurred to [her] to call.'" (Id. at ¶ 13).

As an MCA, Plaintiff's job duties included: assisting customers, replenishing items, folding and sizing merchandise, cleaning and dusting, tidying fitting rooms, and pricing. (DSMF & PRSMF at ¶ 3; PSMF at ¶ 9). When Plaintiff began her employment with Sears, she had completed her treatment and therapy related to her brain injury though she alleges she still suffered disabilities from that injury. (DSMF & PRSMF ¶ 18). In August of 2008, during her first year of employment with Sears, Plaintiff provided Sears with a note from her doctor that indicated that she could not engage in heavy lifting and that

3

she could not work late hours. (Id. at ¶ 19).  In response to
the restriction, Sears scheduled Plaintiff to work from either
9:30 or 10:00 am until 2:00 pm. (PRSMF at ¶ 20).  On one
occasion Plaintiff was scheduled to work until 3:00pm.  (PRSMF
at ¶ 20).  Also, in compliance with the restrictions, Sears did
not require Plaintiff to do any heavy lifting.  (DSMF & PRSMF at
¶ 21).

    Noemy Echevarria held the position of Softlines Assistant
Store Manager in the Vineland store from approximately 2007 to
June of 2009.  (DSMF & PRSMF at ¶ 23).  Echevarria oversaw the
MCAs, including Plaintiff, during that time.  (PSMF at ¶ 13).
Echevarria testified that she did not have any problems with
Plaintiff's work when she worked for her.  (PSMF at ¶ 16).
Plaintiff does not recall ever receiving or signing two
performance reviews completed by Echevarria, produced by Sears:
one from September 2007, which reflected an overall performance
rating of 1.8 out of 5, and one from May 2008, which reflected a
performance rating of 2.2 out of 5.  (PRSMF at ¶ 24-25; Defs.'
Ex. K S0037-0040).  Echevarria testified that ratings of 3 were
not normally given out and a 3 would be considered "great."
(PSMF at ¶ 16; Pl.'s Ex. J, Echevarria Dep. at 19:12-21).

    In March of 2010, Daniel Fisher ("Fisher") became the Store
Manager for the Vineland Sears store. (DSMF & PRSMF at ¶ 28).
Shortly thereafter, in May of 2010, Anthony Archie ("Archie")

4

became the Assistant Store Manager for Softlines, who oversaw the MCAs, monitored associate behavior, and was Plaintiff's manager.  (DSMF & PRSMF at ¶¶ 29-30).  At that time, Winifred Hatcher ("Hatcher") was the MCA Lead and both she and Plaintiff worked under Archie.  (PSMF & DRSMF ¶ 18).  Hatcher testified that she never had any problems with Plaintiff's work and that Plaintiff did whatever she asked her to do.  (PSMF at ¶ 20).  Hatcher further testified that she only ever had Plaintiff working on "planograms" which are plans of the store.  (Defs.' Ex. LL, Hatcher Dep. at 16:11-19).  Hatcher stated that planograms did not have to be done often and would not constitute enough work to keep Plaintiff busy; Hatcher was unsure of whether Plaintiff was capable of performing other MCA duties.  (Id. at 27:9-19).

Archie testified that when he first came to the store, he was "trying to get a feel of what every associate was used to and what was going on and what they were doing." (PRSMF at ¶ 32).  Hatcher stated that during a meeting with Plaintiff and Archie, they went over Plaintiff's job description in the first meeting and Plaintiff said very little, and, in the second meeting, Plaintiff was asked to highlight items she could do on the job description.  (PRSMF at ¶ 33).  Instead of highlighting anything, Plaintiff asked to take the description home.  Id. Plaintiff does not recall being asked to highlight a job

description.  (Pl.'s Opp. Br. at 8; Pl.'s Dep. II: 167 & 170-
71). Defendants contend that, as a result of this meeting,
Archie learned that Plaintiff was not performing certain
essential tasks required of her position such as cleaning,
dusting, straightening clothes on racks or tagging clothes.
Plaintiff denies this contention, stating that Archie refused to
provide her with accommodations to allow her to perform certain
tasks, such as gloves and a dust mask.  (DSMF & PRSMF at ¶ 34-
36).

Archie then met with Fisher and Human Resources Lead,
Laurellen Davis ("Davis"), to review Plaintiff's employment file
to determine what medical documentation was on file.  (DSMF &
PRSMF at ¶ 42).  Plaintiff had provided Sears with an August 22,
2008 note from Vineland Medical Associates stating that she is
able to work "with restriction" of "[n]o heavy lifting" and "no
working late hours."  (Defs.' Ex. B at 000010).  After this
meeting with Fisher and Davis, Archie asked Plaintiff for
additional medical paperwork.  (DSMF & PRSMF at ¶ 44).
Plaintiff provided a September 1, 2010 note from her doctor,
Narasimhaloo Venugopal, M.D., which states: "Due to [history of]
pain[,] anoxic encephalopathy[2] she is partly disabled and can

---

[2] Meaning damage to brain tissue due to lack of oxygen.
See http://www.medicinenet.com/encephalopathy/article.htm (last
visited March 31, 2014).

6

only work about four hours during morning hours & early afternoon." (Pl.'s Ex. E at S0071).

Sears asked Plaintiff to obtain more specific documentation regarding her limitations and provided her with a Health Care Provider Certification Form ("Certification Form"). (DSMF & PRSMF at ¶ 48). On November 10, 2010, before Plaintiff returned the Certification Form, Archie contacted Human Resources consultant Adrienne Kane ("Kane") of 88Sears. Kane advised Archie that he could keep Plaintiff off the work schedule "until the accomm[odation] form [was] submitted." (Defs.' Ex. I at S0127).

Nearly a week later, Plaintiff provided a November 16, 2010 note from her doctor which states, in relevant part: "Barbara Church is under the care of this practice for a variety of medical problems including: ataxia,[3] cerebral and encephalopathy anoxic, due to a traumatic brain injury. She has general weakness and problems with balance. She can only work approximately 5 hours per day. She is unable to do repetitive lifting due to muscle fatigue." (Defs.' Ex. J at S0136). She also provided Sears with the Certification Form dated November

---

[3] Ataxia describes a lack of muscle control during voluntary movements, such as walking or picking up object. See http://www.mayoclinic.org/diseases-conditions/ataxia/basics/definition/con-20030428 (last visited March 31, 2014).

17, 2010, which states that Plaintiff is substantially limited in the major life activities of talking and performing manual tasks. (Defs.' Ex. J at S0134-0135). The specific description reads: "Mild speech difficulty. No lifting over 20 lbs and only for 30 mins of this per hour." Id. Under "Essential Functions Determination," the Form states: "The job function(s) this patient is unable to perform are: 1) [d]ue to traumatic brain injury has balance problems & unable to climb on ladders, balance self[,] 2) [d]ue to muscle weakness, can only work about 5 hrs a day & can only do lifting on an off – not continuously." Id. Under the section entitled "Accommodation Request," the only item checked is "Modified Work Schedule" - 5 hours per day. Id.

Plaintiff understood that the purpose of the Certification Form was for Sears to identify any limitations on Plaintiff's ability to perform her job at Sears. (DSMF & PRSMF at ¶ 54). After receiving Plaintiff's Certification Form, Fisher, Archie and Davis consulted with Kane to determine how to proceed. (DSMF & PRSMF at ¶ 57). Kane reviewed the Certification Form with Sears' accommodations consultant, Jeanne Bartlett, and the store was advised to attempt to meet with Plaintiff again to review the job description and highlight the job duties that she could perform. (DSMF & PRSMF at ¶ 58-59).

In order to find out what duties she could perform, Sears scheduled a meeting with Plaintiff for December 6, 2010. (DSMF & PRSMF at ¶ 60). Plaintiff arrived for the meeting with her husband, David Church, and was informed that he was not permitted to attend the meeting with Plaintiff. (DSMF & PRSMF at ¶ 62-63). Mr. Church testified that he came to the meeting to "protect" his wife and make sure she did not get taken advantage of. (PSMF at ¶ 71). Mr. Church has never worked at Sears, does not have any power of attorney status on behalf of Plaintiff, and is not Plaintiff's legal guardian. (DSMF & PRSMF at ¶ 75-77). Plaintiff admits that she does not have a problem understanding people when they speak, but alleges she does have issues processing and remembering what people said. (PRSMF at ¶ 71). No one from Sears asked or directed either Mr. Church or Plaintiff to leave, but, after being told her husband was not permitted to attend the meeting, Plaintiff opted to leave the meeting rather then proceed. (DSMF & PRSMF at ¶ 64-65).

After the failed December 6, 2010 meeting, the store consulted with Kane regarding how to proceed with respect to Plaintiff and Kane advised the store to contact the Plaintiff by telephone to try to determine what job duties she could perform. (DSMF & PRSMF at ¶ 79-80). Kane testified that she wanted the store "to do the interactive process to the greatest extent they possibly could." (DSMF & PRSMF at ¶ 81).

Archie, Fisher, and Davis called Plaintiff to review her job description with her over the phone.  Plaintiff alleges that she was out Christmas shopping when they called and read the exhaustive description to her over the phone, telling Plaintiff not to interrupt until they were done.  (PRSMF at ¶ 82).  Plaintiff did not respond with what duties she could do, but alleges that the manner in which the call was made was "purposefully calculated to elicit no response and take advantage of [her] short term memory issues."  (PRSMF at ¶ 85).  Plaintiff testified that Archie and Fisher went through her duties during the call and did not let her "object." (Pl's Dep. II 202:17–18).

Plaintiff's employment was terminated on December 11, 2010.  Davis completed the paperwork for Plaintiff's termination, which was coded under a "voluntary" termination code – "HEA" or "health reasons" – which is an internal code that relates to the eligibility of an employee to reapply for a position with Sears.  (DSMF & PRSMF at ¶ 89).  Plaintiff has admitted that no one at Sears expressly told her that her employment was being terminated because of her disability.  (DSMF & PRSMF at ¶ 91).

B) <u>Plaintiff's Allegations and Complaint</u>

Pursuant to her First Amended Complaint, Plaintiff alleges that Archie, shortly after becoming her manager, "began a

10

campaign of harassment and discrimination against [her] because of her disability." (PSMF at ¶ 22). Plaintiff contends that this harassment and discrimination included, _inter alia_:

- Repeatedly requesting medical certifications despite the fact that she did the same job duties and already had accommodation paperwork in her file;
- Reducing her hours and eventually removing her from the schedule;[4]
- Repeatedly asking her to perform duties outside her restrictions such as climb ladder and work extra hours;
- Refusing to provide her with dust masks and gloves for cleaning;
- Attempting to "guilt" Plaintiff into working later and trying to make her feel bad for her special needs;
- Asking Plaintiff accommodation questions in a manner in which she could not respond because of her short-term memory issues; and
- Giving Plaintiff "snippy" responses to her refusal to work beyond her medical limits.

(PSMF at ¶ 22).

Based on these factual allegations, Plaintiff's First Amended Complaint, removed to this Court by Defendants, contains three separate counts all asserted pursuant to the New Jersey Law Against Discrimination ("LAD"), N.J.S.A. § 10:5-1 _et seq._ Count One is a claim for disability discrimination based on Sears' reduction of Plaintiff's hours and her termination, which, Plaintiff contends was the result of her disability. In Count Two, Plaintiff contends that Sears failed to engage in

---

[4] More specifically, Plaintiff alleges that her hours were reduced in or about June 2010, but Plaintiff has admitted that she previously had problems with her hours being reduced even before Archie joined the store. (DSMF & PRSMF at ¶ 95 & 98).

good faith in the interactive process required by the LAD to determine whether Plaintiff's disability could be accommodated. Finally, in Count Three, Plaintiff avers that the actions of Archie and Fisher created and allowed a hostile work environment in violation of the LAD.  Defendants have moved for summary judgment on all three Counts.


### III. Standard:

Summary judgment shall be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is "material" if it will "affect the outcome of the suit under the governing law . . . ."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute is "genuine" if it could lead a "reasonable jury [to] return a verdict for the nonmoving party."  Id.  When deciding the existence of a genuine dispute of material fact, a court's role is not to weigh the evidence: all reasonable "inferences, doubts, and issues of credibility should be resolved against the moving party."  Meyer v. Riegel Prods. Corp., 720 F.2d 303, 307 n.2 (3d Cir. 1983).

However, a mere "scintilla of evidence," without more, will not give rise to a genuine dispute for trial.  Anderson, 477 U.S. at 252.  Further, a court does not have to adopt the

version of facts asserted by the nonmoving party if those facts are "utterly discredited by the record [so] that no reasonable jury" could believe them.  <u>Scott v. Harris</u>, 550 U.S. 373, 380 (2007).  In the face of such evidence, summary judgment is still appropriate "where the record . . . could not lead a rational trier of fact to find for the nonmoving party . . . ." <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).

The movant "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986)(quoting Fed. R. Civ. P. 56(c)).  Then, "when a properly supported motion for summary judgment [has been] made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'"  <u>Anderson</u>, 477 U.S. at 250 (quoting Fed. R. Civ. P. 56(e)).  The non-movant's burden is rigorous: it "must point to concrete evidence in the record"; mere allegations, conclusions, conjecture, and speculation will not defeat summary judgment. <u>Orsatte v. N.J. State Police</u>, 71 F.3d 480, 484 (3d Cir. 1995); <u>Jackson v. Danberg</u>, 594 F.3d 210, 227 (3d Cir. 2010)(citing

Acumed LLC v. Advanced Surgical Servs., Inc., 561 F.3d 199, 228
(3d Cir. 2009)) ("[S]peculation and conjecture may not defeat
summary judgment.").

## IV.  Analysis:

### Count I - Disability Discrimination

The Court turns first to Plaintiff's claim of disability
discrimination brought pursuant to the LAD.  New Jersey enacted
the LAD in furtherance of the state's public policy "to
eradicate invidious discrimination from the workplace." Carmona
v. Resorts Int'l Hotel, Inc., 915 A.2d 518, 528 (N.J. 2007)
(citations omitted).  It is unlawful "[f]or an employer, because
of the race . . . age . . . [or] disability . . . of any
individual, . . . to discharge" such a person "unless justified
by lawful considerations . . . ." N.J. Stat. Ann. § 10:5-12(a).
The LAD "must be applied sensibly with due consideration to the
interests of the employer, employee, and the public." Muller v.
Exxon Research & Engineering Co., 786 A.2d 143, 147 (N.J. Super.
Ct. App. Div. 2001)(citing Jansen v. Food Circus Supermarkets,
Inc., 541 A.2d 682 (N.J. 1988)).

As an initial matter, the parties dispute the proper
standard to be used in analyzing Plaintiff's disability
discrimination claim – i.e., the three-step, federal burden-
shifting framework established in McDonnell Douglas v. Green,

411 U.S. 792 (1973), or the "mixed-motive" framework as set

forth in Price Waterhouse v. Hopkins, 490 U.S. 228 (1989),

"under which a plaintiff may show that an employment decision

was made based on both legitimate and illegitimate reasons."

Makky v. Chertoff, 541 F.3d 205, 213 (3d Cir. 2008).

This Court will begin its analysis with the familiar

burden-shifting framework.  Under this standard, to state a

prima facie case of disability discrimination under the LAD,

Plaintiff must show that:

(1) that plaintiff is in a protected class;

(2) that plaintiff was otherwise qualified and performing

the essential functions of the job;

(3) that plaintiff was terminated; and

(4) that the employer thereafter sought similarly qualified

individuals for that job.  Victor v. State, 203 N.J. 383, 409

(2010).

After the plaintiff has established a prima facie case, the

burden of production shifts to the defendant to offer a

legitimate, nondiscriminatory reason for the adverse employment

action.  See Bergen Commercial Bank, 157 N.J. at 210.  Then,

during the third stage of the process, the burden of production

shifts back to the employee, who has the burden to prove by a

preponderance of the evidence that the legitimate

nondiscriminatory reasons articulated by the employer was not

15

the true reason for the employment decision but was "merely a pretext for discrimination." Id. at 211 (quotations omitted). "The ultimate burden of persuasion that the employer intentionally discriminated against the employee remains with the employee at all times." Jansen, 541 A.2d at 691 (citations omitted).

The Defendants contend that Plaintiff cannot establish a prima facie case because she cannot establish the second prong, that is: "she has not set forth any evidence that she was qualified for the position of [MCA] with Sears and that she was actually performing the job at a level that met Sears' expectations." (Defs.' Br. at 18). In Zive v. Stanley Roberts, the New Jersey Supreme Court made clear that the burden at the second prong is a light one to be based on objective standards: "as long as [a plaintiff] adduces evidence that he has, in fact, performed in the position up to the time of termination, the slight burden of the second prong is satisfied." 182 N.J. 436,455-56 (2005). While the burden is slight, this Court is persuaded that Plaintiff has presented no competent evidence that she was performing the objective essential functions of the job.

The parties have not provided this Court with a clear explanation of the governing job description, though several were introduced at Archie's deposition. (See PSMF, Ex. A,

16

Archie 2-6).  Despite this lack of clarity surrounding the
operative description, each job description for an MCA provided
by the parties set forth that the duties, responsibilities and
requirements set forth therein were representative in nature and
not exhaustive.  Moreover, the job description with the date of
May 4, 2008 specifically states that the MCA is to perform other
duties and jobs as assigned.  (Id. at Archie 5).

Regardless, Plaintiff has admitted that cleaning and
dusting were among the essential job duties of an MCA, (PRSMF at
¶ 3; PSMF at ¶9; Pl.'s Opp. Br. at 4[5]).  She argues, however,
that she could not clean – i.e., perform that aspect of her job
– because Archie refused "the accommodation of gloves and a dust
mask."  Pl.'s Opp. Br. at 25.  See Church Dep. I at 60:10-13 ("I
asked for gloves and [Archie] couldn't provide them."); PRSMF at
¶ 36 ("When asked to clean or dust by Archie, [Plaintiff]
requested an accommodation of gloves and a dust mask, Archie
refused these accommodations.  Plaintiff was willing to perform
these tasks with this simple accommodation.")

Plaintiff has not, however, demonstrated by any competent
evidence of record that this "accommodation" was required
because of her disability, as she has demonstrated no medical

---

[5] "As an MCA, Mrs. Church's responsibilities included
organizing the sales floor, organizing racks by size, dusting,
greeting and helping customers and pricing objects."

need for this alleged accommodation.  <u>See</u> <u>Mickens v. Lowe's</u>
<u>Cos., Inc.</u>, 07-CV-6148, 2009 U.S. Dist. LEXIS 115876, at *20, n.
12 (D.N.J. Dec. 14, 2009)(stating that while plaintiff preferred
day shift work, he was not restricted to working a day shift by
his doctors, "and Lowe's was, therefore, under no obligation to
place him in such a position.").  There was nothing in any of
the medical certification forms provided by Plaintiff to Sears
saying anything about dusting or cleaning or her need for
gloves.  Plaintiff's failure to complete the cleaning and
dusting essential function of her job was not based on a lack of
accommodation of a medical need, as Plaintiff alleges, but based
merely on her preferences and related refusal to complete the
task.  Therefore, this Court agrees with Defendants that
Plaintiff has not produced evidence that she was adequately
performing the essential functions of her job, either with or
without an accommodation.  <u>See</u> <u>Mathew v. Cardone Industries,</u>
<u>Inc.</u>, No. 97-7490, 1998 U.S. Dist. LEXIS 9899, at * 9-10 (E.D.
Pa. July 2, 1998)("[r]easonable accommodations are. . . not
accommodations based upon an individual preferences. . . [and]
it appears unreasonable, to say the least, to require an
employer's 'reasonable' accommodation to include accommodations
for medical needs of which the employer has no competent
knowledge and for which the employee has provided no
substantiation.") <u>aff'd</u> 205 F.3d 1329 (3d Cir. 1999).  For this

reason, Plaintiff cannot establish a prima facie case of disability discrimination and summary judgment is appropriate. See Victor, 203 N.J. at 409 (setting forth elements of prima facie case); Svarnas v. AT& T Communications, 326 N.J. Super. 59, 73, 740 A.2d 662 (App. Div. 1999) ("nothing in the LAD is construed to prevent the termination of any person who in the opinion of the employer, reasonably arrived at, is unable to perform adequately the duties of employment."); Mickens, 2009 U.S. Dist. LEXIS 115876 at *17 (stating that a plaintiff "cannot claim that the assignment impermissibly exceeded his medical restrictions when the evidence shows that he simply refused to do the work.").[6]

Moreover, Plaintiff has not set forth any arguments, let alone evidence, related to the fourth prong that Sears "sought another to perform the same work after she was removed from the position" as required under the last prong of the prima facie test. See Victor, 203 N.J. at 409. In sum, because Plaintiff cannot establish a prima facie case of disability discrimination under the LAD, summary judgment will be granted in favor of

---

[6] This said, this Court does not find Defendants' arguments about Plaintiff's performance ratings of 1.8 and 2.2 out of 5 persuasive in light of Echevarria's testimony that ratings of 3 were not normally given out and a 3 would be considered "great," Pl.'s Ex. J. at 19:12-21 (PSMF at ¶ 16).

Defendants as to Count One of Plaintiff's First Amended
Complaint.

Even assuming, however, that Plaintiff has carried her
burden of establishing a prima facie case of disability
discrimination, the burden would then shift to Sears to
articulate a neutral, non-discriminatory reason for Plaintiff's
termination.  The Court finds that Sears has carried this burden
by presenting evidence, including Plaintiff's admissions
discussed above, that she was not performing aspects of her job.

The burden thus, shifts back to Plaintiff to show that
Defendants' legitimate, non-discriminatory reason is a pretext
for discrimination.  Bergen Commercial Bank, 157 N.J. at 210.
Plaintiff has not met her burden here.  Plaintiff has offered no
evidence to demonstrate that she was satisfactorily completing
her essential job functions, which is insufficient to survive
summary judgment.  See Cridland v. Kmart, 929 F. Supp. 2d 377,
389-90 (E.D. Pa. Mar. 11, 2013)(finding that "plaintiff's
uncorroborated testimony about discriminatory treatment cannot –
in its own – demonstrate invidious intent at the summary
judgment stage.").  Therefore, Plaintiff has not carried her
burden of demonstrating such weaknesses, implausibilities,
inconsistencies, incoherencies, or contradictions in the
employer's proffered legitimate reasons for its action such that
a reasonable factfinder could rationally find them "unworthy of

credence." <u>Fuentes v. Perskie</u>, 32 F.3d 759, 765 (3d Cir. 1994); <u>see</u> <u>also</u> <u>Zive</u>, 182 N.J. 4365 at 456 ("a plaintiff's acknowledgement of performance deficiencies. . .will generally lighten the employer's burden on the second phase [of the burden shifting framework] and render more difficult plaintiff's ability to prove pretext.").

Plaintiff disputes the applicability of the <u>McDonnell-Douglas</u> framework to the instant matter and, instead, contends that she has produced direct evidence of discrimination sufficient to support the use of the mixed-motive framework as set forth in <u>Price Waterhouse v. Hopkins</u>, 490 U.S. 228 (1989). (Pl.'s Opp. Br. at 15).  More specifically, Plaintiff sets forth the following allegations as grounds for her argument:

- At his deposition, Fisher, who terminated Plaintiff, stated that Plaintiff was terminated because "it was an issue where we didn't want her to hurt herself or the company to be at fault for her like having to perform something";
- Davis admitted to coding Plaintiff's termination on Sears' paper work for "health reasons";
- Archie stated to Plaintiff "sorry we're all not special and can't only work in the mornings."

(Pl.'s Opp. Br at 19).

While both parties discuss the need for direct evidence in the mixed-motive, LAD context, the applicable mixed-motive standard in this case is muddled.  <u>See</u> <u>Mehta v. Fairleigh Dickenson University</u>, 530 Fed. Appx. 191, 195, n. 3 (3d Cir. 2013)(applying the direct evidence standard in a LAD case and

21

stating that whether the mixed-motive framework as set forth in the <u>Price Waterhouse</u> decision applies in that context is a "thorny issue."); <u>see also</u> <u>Makky v. Certoff</u>, 541 F.3d 205, 214 (3d Cir. 2008)("a plaintiff does not need to present 'direct evidence' of discrimination to proceed on a mixed-motive theory of discrimination under Title VII"); <u>Myers v. AT&T</u>, 380 N.J. Super. 443, 461 (N.J. App. Div. 2005)(stating, in the LAD context that "the direct evidence requirement <u>may</u> no longer be viable in any mixed motive analysis")(emphasis added).

Clearly, "there is no consensus among the federal courts respecting the scope of the <u>Desert Palace</u> decision . . . nor is their guidance from [the New Jersey] Supreme Court concerning how the decision in <u>Desert Palace</u> might alter its analysis of the <u>Price Waterhouse</u> formulation." <u>Myers</u>, 380 N.J. at 460. That said, this Court looks to the recent decisions of both the Third Circuit and New Jersey courts discussing the mixed-motive standard, and, more specifically, cases discussing mixed-motive in the directly analogous LAD, disability discrimination claim context for guidance in resolving the instant motion.[7]

---

[7]    It is worth noting that following the Supreme Court's ruling in <u>Gross v. FBL Fin. Servs.</u>, 557 U.S. 167 (2009), courts in this Circuit have concluded that the mixed-motive analysis does not apply under the Americans with Disabilities Act. <u>See e.g.</u>, <u>Lamberson v. Commonwealth of Pa.</u>, 963 F. Supp. 2d 400, 413 (M.D. Pa., 2014); <u>Warshaw v. Concentra Health Servs.</u>, 719 F. Supp. 2d 484, 502 (E.D. Pa. 2010).

In <u>A.D.P. v. ExxonMobil Research and Engineering Co.</u>, 428
N.J. Super. 518, (N.J. App. Div. 2012), the Appellate Division
embraced the need for direct evidence in the mixed-motive
context, stating that "[a]lthough there is a lack of consensus
among federal courts as to the application of the <u>Price
Waterhouse</u> principles to various statutory causes of action
following the United States Supreme Court's decision in <u>Desert
Palace, Inc. v. Costa</u>, 539 U.S. 90, 123 S. Ct. 2148, 156 L. Ed.
2d 84 (2003), our Supreme Court has interpreted '**mixed motive'
cases and their direct evidence requirement** to be broadly
applicable to discrimination cases without regard to the
statutory context."  428 N.J. Super. at 533, n.5 (emphasis
added).  The court went on to state that direct evidence "is
evidence that an employer placed substantial reliance on a
proscribed discriminatory factor in making its decision to take
the adverse employment action."  <u>Id.</u> at 532 (internal quotations
omitted).

In addition to the New Jersey cases discussing the LAD, the
Third Circuit recently stated in the Title VII context that,

> [u]nder the alternative, 'mixed-motive' analysis,
> if the plaintiff shows "by direct evidence that an
> illegitimate criterion was a substantial factor in the
> [employment] decision," the burden shifts to the
> defendant "to convince the trier of fact that it is
> more likely than not that the decision would have been
> the same absent consideration of the illegitimate
> factor."

<u>Tolan v. Temple Health Sys. Trans. Team, Inc.</u>, (quoting <u>Brown v.</u>
<u>J. Kaz, Inc.</u>, 581 F.3d 175, 182 (3d Cir. 2009) (quoting <u>Price</u>
<u>Waterhouse</u>, 490 U.S. at 276 (O'Connor, J., concurring)).

    Applying a mixed-motive standard requiring direct evidence,
as set forth in cases such as <u>A.D.P.</u>, 428 N.J. Super. 518,
reveals that Plaintiff has failed to produce such evidence here
sufficient to survive summary judgment.  As clearly stated by
the New Jersey Supreme Court, direct evidence of discrimination
is of a nature that must "demonstrate not only a hostility
toward members of the employee's class, but also a direct causal
connection between that hostility and the challenged employment
decision."  <u>Bergen Commercial Bank v. Sisler</u>, 157 N.J. 188, 208
(1999).  In her brief, Plaintiff fails to cite Fisher's
statement in its entirety, which, when read in toto, makes clear
that the termination was based on the failure of Plaintiff to
tell Sears what job tasks she could do:

> it was an issue where we didn't want her to hurt herself or
> the company to be at fault for any, like having her perform
> something.  So that was what we did, based off of – what we
> did, <u>based off of her not being able to tell us what she</u>
> <u>could do</u>.

(Defs.' Ex. E, Fisher at 93:15-20) (emphasis added).

    Neither Fisher's statement at deposition, the coding of
termination for "health reasons", which, Defendants have shown
was done so that Plaintiff would be eligible for re-hire and not

24

as the basis of her termination,[8] nor Archie's comment (which also serves as the basis for Plaintiff's hostile work environment claim) suffice to demonstrate either the hostility or nexus between such hostility and the decision to terminate Plaintiff that would be required to warrant the application of the mixed-motive framework.  See Bergen, 157 N.J. at 208-09 (referring to case law finding that an employer's comment that "everyone over 35 should be sacked" as circumstantial evidence as compared to a scrap of paper saying "fire Rollins-she is too old" as direct evidence).  Moreover, it is undisputed that no one at Sears expressly told Plaintiff that her employment was being terminated because of her disability.  (DSMF & PRSMF at ¶ 91).

Even eschewing the need for direct evidence and employing a mixed-motive framework in line with cases like Makky, 541 F.3d at 214, which states that "a plaintiff does not need to present 'direct evidence' of discrimination to proceed on a mixed-motive theory of discrimination under Title VII," this Court finds that

---

[8] Defendants have presented evidence that the code is not the reason Plaintiff was terminated. See Deposition of Sarah Levee, Sears' Fair Employment Consultant at 38:9-13 "Q: is that your understanding of the reason why she was terminated, for health reasons?  A:  No. This is not a reason why someone was terminated; it is simply a code used internally."  Moreover, Plaintiff has admitted that the termination code relates to the eligibility of an employee to reapply for a position with Sears. (PRSMF at ¶ 89).

Plaintiff's claims cannot survive summary judgment.[9]  Under the mixed-motive framework as articulated in Desert Palace and applied in a LAD context in Myers stated that "[a]t a bare minimum, a plaintiff seeking to advance a mixed-motive case will have to adduce circumstantial evidence of conduct or statements by persons involved in the decisionmaking [sic] process that may be viewed as directly reflecting the alleged discriminatory attitude."  See Myers, 380 N.J. Super. at 462 (quoting Fleming v. Corr. Healthcare Solutions, 164 N.J. 90, 101 (2000)(internal quotations omitted)).  "If a plaintiff can show that the discriminatory motive and the challenged action are linked, the burden then shifts to the defendant to show that it is "more likely than not" that the legitimate motive was the primary reason behind the action." Cottrell v. Good Wheels, 458 Fed. Appx. 98, 102 (3d Cir. Jan. 23, 2012)

Even assuming, arguendo, that Plaintiff's disability was part of the decision to terminate her, for reasons discussed at length above, it is clear that the Defendant would have taken the same course of action in light of the undisputed fact that Plaintiff was simply refusing to perform job duties for which she did not require an accommodation.  See Cottrell v. Good

_____

[9] See Myers v. AT&T, 380 N.J. Super. at 463 (deciding a case in the alternative i.e., under either the standard as articulated in Desert Palace or the stricter Price Waterhouse standard).

<u>Wheels</u>, No. 08-1738, 2011 U.S. Dist. LEXIS 26646, at * 21-22, n.5 (D.N.J. Mar. 15, 2011)(stating that "under the mixed-motive analysis, if a defendant takes adverse action toward a plaintiff for both discriminatory and nondiscriminatory reasons, the defendant bears the burden of proving that he would have taken the same action notwithstanding his discriminatory considerations" and granting summary judgment where the evidence supported the conclusion that defendant banned plaintiff because he was disrupting customers), <u>aff'd</u> 458 Fed. Appx. 98 (3d Cir. Jan. 23, 2012). Moreover, "in a mixed-motive employment discrimination case a plaintiff who does not possess the objective baseline qualifications to do his/her job will not be entitled to avoid dismissal." <u>Makky</u>, 541 F.3d at 215. While the issue of job qualification is often one of fact, <u>see id.</u>, in the instant case, Plaintiff has admitted that she refused to complete tasks for which she was not entitled to an accommodation – <u>i.e.</u>, cleaning and dusting.

<u>Count II - Failure to Accommodate</u>

Under the LAD, an employer "must make a reasonable accommodation to the limitations of a [handicapped] employee or applicant . . . unless the employer can demonstrate that the accommodation would impose an undue hardship on the operation of its business." N.J. Admin. Code § 13:13-2.5(b); <u>see Potente v.</u>

27

Cnty. of Hudson, 900 A.2d 787, 791 (N.J. 2006).  New Jersey
courts have recognized an interactive process of arriving at a
reasonable accommodation for a disabled employee.  Jones v.
Aluminum Shapes, Inc., 772 A.2d 34, 41 (N.J. Super. Ct. App.
Div. 2001).  A disabled employee can show that his employer
failed to participate in this interactive process by
demonstrating that:

> (1)  The employer knew about the employee's disability;
>
> (2)  The employee requested accommodation or assistance for
> his disability;
>
> (3)  The employer did not make a good faith effort to
> assist the employee in seeking accommodation; and
>
> (4)  The employee could have been reasonably accommodated
> but for the employer's lack of good faith.

Jones, 772 A.2d at 41; Tynan v. Vicinage, 798 A.2d 648 (N.J.
Super. Ct. App. Div. 2002).  "An employee must satisfy all four
prongs of the test to demonstrate that there was no 'interactive
process.'"  Mickens, 2009 U.S. Dist. LEXIS 1115876, at *13.
Acting in bad faith can be demonstrated by the "'failure by one
of the parties to help the other determine what specific
accommodations are necessary,' 'obstruct[ing] or delay[ing] the
interactive process' of negotiating a reasonable accommodation,
and 'fail[ing] to communicate, by way of initiation or
response.'"  Rosenfeld v. Canon Business Solutions, Inc., No.
09-4127, 2011 U.S. Dist. LEXIS 115415, at * 43-44 (D.N.J. Sept.

26, 2011)(quoting <u>Taylor v. Phoenixville School Dist.</u>, 184 F.3d 296, 312 (3d Cir. 1999)).

In support of her failure to accommodate claim, Plaintiff alleges that while she requested that she not be required to climb ladders and that her hours be limited to morning and early afternoon, Archie repeatedly asked her to climb ladders and work late hours.  (DSMF & PRSMF at ¶ 99-100).  Plaintiff has admitted that Sears complied with the explicit restrictions in the notes from her doctor with respect to working late hours and avoiding heavy lifting.  (DSMF & PRSMF at ¶ 20-21).  She further admits that even though Archie asked her to climb ladders in violation of her medical restriction, which Defendants dispute, she refused to do so. (DSMF & PRSMF at ¶ 101-02 & 104).  Finally, Plaintiff contends that Sears' refusal to allow her husband to "help her in the process" constitutes bad faith and imposes responsibility on Sears for a breakdown in the interactive process. (Pl.'s Opp. Br. at 36).

For the reasons discussed above, however, this Court has found that, based on her own admissions, Plaintiff was not performing the essential functions of her job.  While Plaintiff contends that she was not completing cleaning tasks because Sears refused to accommodate her by providing gloves and a dust mask, Plaintiff has shown no evidence of entitlement to the accommodation she sought.  <u>See</u> <u>Mickens</u>, 2009 U.S. Dist. LEXIS

29

115876, at *20, n. 12 (stating that while plaintiff preferred day shift work, he was not restricted to working a day shift by his doctors, "and Lowe's was, therefore, under no obligation to place him in such a position."); Mathew, 1998 U.S. Dist. LEXIS 9899 at * 9-10 ("it appears unreasonable, to say the least, to require an employer's 'reasonable' accommodation to include accommodations for medical needs of which the employer has no competent knowledge and for which the employee has provided no substantiation.") aff'd 205 F.3d 1329 (3d Cir. 1999). Similarly, Plaintiff has failed to present any evidence beyond her own unsupported allegation that her husband's presence at the December 6, 2010 meeting was a needed accommodation. See id. In other words, Plaintiff cannot demonstrate that she "could have been reasonably accommodated but for the employer's lack of good faith." Jones, 772 A.2d at 41.

Even without finding that Plaintiff was not performing the essential functions of her position, this Court finds that Plaintiff has not demonstrated that Sears failed to engage in the interactive process: "Employers can show their good faith in a number of ways, such as taking steps like the following: meet with the employee who requests an accommodation, request information about the condition and what limitations the employee has, ask the employee what he or she specifically wants, show some sign of having considered employees' request,

and offer and discuss available alternatives when the request is too burdensome." <u>Taylor</u>, 184 F.3d at 317.[10]

In this matter, Plaintiff does not dispute that the December 6, 2010 meeting was set up at Sears' initiative to discuss Plaintiff's need for accommodations and the job duties that she could perform. (DSMF & PRSMF at ¶ 58-60). Moreover, while no one from Sears asked or directed either Church or Plaintiff to leave, after being told her husband was not permitted to attend the meeting, it was Plaintiff's decision to leave the meeting rather then proceed. (DSMF & PRSMF at ¶ 64-65). In other words, Plaintiff, not Sears, halted this aspect of the interactive process. Additionally, Plaintiff does not contest that, consistent with the dictates of <u>Taylor</u>, Sears requested information about the condition and what limitations she had; in fact, Sears' inquiries regarding Plaintiff's limitations form the very basis of some her allegations of discrimination and harassment. <u>See</u> <u>Mickens</u>, 2009 U.S. Dist. LEXIS 115876 at *26 ("Plaintiff's own testimony indicates that there was an interactive process. For instance, Plaintiff suggests that he continually had to go to his doctor to

---

[10] While decided in the context of the Americans with Disabilities Act, this case is instructive as "both federal and New Jersey state courts have consistently looked to federal law for guidance in construing the NJLAD." <u>LaResca v. American Telephone & Telegraph</u>, 161 F. Supp. 2d 323, 334 (D.N.J. 2001).

determine his medical restrictions. . . ."). As such, Plaintiff has failed to meet her burden of demonstrating that Sears failed to engage in the interactive process and Plaintiff's failure to accommodate claim shall be dismissed. See Rosenfeld, Inc., 2011 U.S. Dist. LEXIS 115415 at * 49 (granting summary judgment where plaintiff failed to prove breakdown of interactive process and failure to identify the existence of a reasonable accommodation).[11]

Count III - Hostile Work Environment

In support of her hostile work environment claim, Plaintiff alleges that Archie and others (not specified, as Plaintiff could not recall at her deposition who these people were) would make sigh noises at her, roll their eyes and make rude comments to her because of her disability. (DSMF & PRSMF at ¶ 107). She also states that Archie and others would try to get her to climb ladders, guilt her into working later hours and tried to make her feel bad for having special needs. (DSMF & PRSMF at ¶ 107). In support of her hostile work environment claim, the only specific comment Plaintiff recalls is Archie saying, "Sorry we're not all special and can't only work in the mornings."

_____

[11] While Plaintiff contends that Sears took advantage of her short term memory, she has presented no competent evidence that she made Sears aware of those issues via a doctor's note or otherwise.

(DSMF & PRSMF at ¶ 107-108).  She also contends that her work environment was hostile because Archie:

- Repeatedly requested medical certifications;
- Reduced her hours and eventually removed her from the schedule;
- Refused to provide her with simple accommodations such as dust masks for cleaning;
- Purposefully asked her accommodation questions in a manner in which she could not respond because of short-term memory issues; and
- Gave her "snippy" responses to her refusal to work beyond her documented medical limits.

(Pl.'s Opp. Br. 39).  Plaintiff could not identify when such conduct occurred and could not identify anyone else who engaged in any conduct in support of her hostile work environment claim. (DSMF & PRSMF at ¶ 110).

In order to demonstrate a hostile work environment claim under the LAD, a plaintiff must demonstrate that the harassment (1) would not have occurred but for the employee's protected status, and was (2) severe or pervasive enough to make a (3) reasonable person believe that (4) the conditions of employment have been altered and that the working environment is hostile or abusive." Pikowski v. Gamestop, Inc., 2013 U.S. Dist. LEXIS 175193, at *28-29 (D.N.J. Dec. 11, 2013) (citing Shepard v. Hunterdon Developmental Ctr., 174 N.J. 1, 28 (2002)). Whether conduct is "severe or pervasive" depends on, among other things, whether the conduct is frequent, whether it is physically threatening or merely verbally offensive, and whether

it unreasonably interferes with plaintiff's job performance.
Anastasia v. Wakefield, 455 Fed. Appx. 236, 239 (3d Cir. 2011);
Godfrey v. Princeton Theological Seminary, 196 N.J. 178, 195,
952 A.2d 1034 (2008).

Even taking all of Plaintiff's allegations as true for
purposes of this motion, and considering the "totality of
circumstances"[12] this Court finds that Plaintiff has failed to
demonstrate conduct sufficiently severe or pervasive enough to
make a reasonable person believe the conditions of her
employment were hostile or abusive.  While it is well
established that even a single severe act can suffice to support
a claim for a hostile work environment,[13] Plaintiff's allegations
of comments made rise nowhere near the level of severity found
in such cases and in the one disability-based hostile work
environment case cited by Plaintiff in support of her claim.
See Leonard v. Metro. Life Ins. Co., 318 N.J. Super 337, 341
(N.J. App. Div. 1999)(denying summary judgment based on two
comments: "I don't give a f___ about you being diabetic and
having low blood sugar. . . .We're going to do things my way or

---

[12] Andrews v. City of Philadelphia, 895 F.2d 1469, 1482 (3d
Cir. 1990)(stating that in determining whether the conduct at
issue is sufficiently extreme, the court must consider the
totality of circumstances).
[13] See e.g., Taylor v. Metzger, 152 N.J. 490 (1998)(finding
the use of one racist slur extreme and outrageous under the
circumstances).

we're not going to do them[,]" [and] "f___ [you] being diabetic
and having to stop for lunch."). As stated above, the only
specific comment identified by Plaintiff in support of her
hostile work environment claim is Archie saying, "[s]orry we're
not all special and can't only work in the mornings[,]" (DSMF &
PRSMF at ¶ 107-108), and this Court is mindful that such
"'offhand comments, and isolated incidents (unless extremely
serious)' are not sufficient to sustain a hostile work
environment claim." Caver v. City of Trenton, 420 F.3d 243, 262
(3d Cir. 2005)(quoting Faragher v. City of Boca Raton, 524 U.S.
775, 788 (1998)).

     That said, "the New Jersey Supreme Court has instructed
that 'it is insufficient to assess incidents individually as if
each were hermetically sealed from the others.'" See Pikowski,
2013 U.S. Dist. LEXIS 175193 at * 28 (citing Godfrey, 196 N.J.
at 196). Therefore, this Court considers Archie's comment in
conjunction with all of Plaintiff's other allegations of
harassing conduct. In doing so, this Court considers the
frequency of the alleged conduct, its severity, whether it is
physically threatening or humiliating, or a mere offensive
utterance, and whether it unreasonably interfered with
Plaintiff's work performance. See Harris v. Forklift Sys. Inc.,
510 U.S. 17, 23 (1993).

The conduct alleged by Plaintiff is, in no way, physically threatening.  Cf. Pikowski, 203 U.S. Dist. LEXIS 175193 at * 29 (denying summary judgment on disability hostile work environment claim where plaintiff alleged, inter alia, that he was called "retard" and "sped" on several occasions kicked in the buttocks).  Moreover, with respect to some of her allegations, Plaintiff has made admissions that undercut her contentions that the complained of conduct was because of her disability – for example, Plaintiff has admitted that she previously had problems with her hours being reduced even before Archie joined the store, (DSMF & PRSMF at ¶¶ 95 & 98), and that her hours fluctuated according to the needs of Sears' business.  (DSMF at ¶ 4; PSMF at ¶ 8).  Moreover, Plaintiff has presented no evidence other than her unsupported allegation that she was pulled off the schedule for any other reason other than the pending return of her completed Certification Form by her doctor.

Even, assuming, however, that the complained of conduct would not have occurred but-for Plaintiff's disability, Plaintiff still fails to allege facts sufficient to demonstrate that the complained of conduct altered the conditions of her work environment and rendered it hostile and abusive.  The LAD is not a guideline for workplace civility and "does not guarantee employees a 'perfect workplace free of annoyances and

36

colleagues [they] find[] disagreeable.'" <u>Incorvati v. Best Buy</u>
<u>Co. Inc.</u>, No. 10-1930, 2010 U.S. Dist. LEXIS 122038, at *31
(D.N.J. Nov. 16, 2010)(quoting <u>Lynch v. New Deal Delivery Serv.</u>,
974 F. Supp. 441, 442 (D.N.J. 1997)).  While Plaintiff asserts
that Archie repeatedly asked her to climb a ladder, she does not
specifically recall how many times he asked, or to whom she
complained about it.  (<u>See</u> Pl.'s Dep. II: 149:1-14).

Without more, Plaintiff's assertions that she was asked to
climb ladders, asked for medical certifications (when a review
of the prior certification from 2008 reveals the need for more
specifics), removing Plaintiff from the schedule, bald
assertions of "snippy" responses and being asked questions in a
manner that was alleged to take advantage of Plaintiff's memory
issues do not constitute "severe conduct that alters the
conditions of one's employment or creates an abusive
environment" and her hostile work environment claim shall be
dismissed.  <u>See Invorvati</u>, 2010 U.S. Dist. LEXIS 122038 at *33-
34 (dismissing plaintiff's hostile work environment claim under
LAD where plaintiff alleged that he was ridiculed because of his
age, because he had suffered a heart attack, and where, on one
occasion, he was sent a picture of a wheel chair/motorized
scooter in a mocking manner); <u>Connolly v. Mitsui O.S.K. Lines</u>
<u>(Am.), Inc.</u>, 2009 U.S. Dist. LEXIS 86195 at *24 (D.N.J. Sept.
21, 2009)(granting summary judgment on plaintiff's hostile work

environment claim where plaintiff alleged that defendant sought documentation of disability-related absences, that her time was monitored closely, that she was denied an ergonomic keyboard and finding that the conduct, even if all of it is related to her disability, was not severe enough to create a hostile work environment).

**V.   Conclusion:**

For the reasons discussed above, this Court will grant summary judgment in favor of Defendants on all claims.  An appropriate Order will issue this date.

s/Renée Marie Bumb
RENÉE MARIE BUMB
UNITED STATES DISTRICT JUDGE

Dated: May 21, 2014